Mathews, S.
The facts in this case are well set forth in the memoranda of the parties. Following is a summary:
During the years from 1894 to 1947, J. John Hassett was a lawyer and one of the leading businessmen of the City of Elmira. During the later years, his business activities predominated, and he became a man of considerable means. Among other concerns, he was especially interested in the Wisner Park Corporation and in the Southern Tier Theater Co., Inc. In each he was the owner of controlling shares of the capital stock, and in each he was the owner of second mortgage interest amounting to $300,000.
During the years from 1900 to 1920, twelve children were born to J. John Hassett and his wife. Two died at an early age, and the other ten lived to the age of seventeen or over. On March 14, 1928, the mother of the children died. Two months later, Austin died. He was the oldest of the children and a practicing attorney. Nine children survived. J. John Hassett, Jr. lived at home with his father prior to his departure for college in 1930. *387 Bessie, who was a total and complete invalid, and had been since birth, lived with her father, and was about twelve years of age in 1930. Huida was in a convent, and the remaining children were away from home attending various schools.
It is very important in this proceeding to understand the personality of J. J ohn Hassett. His success as a lawyer was due to his keen legal ability, and his success as a businessman was due to unusual business sense and sagacity. All of the testimony shows an intense interest in his business and profession, and an almost overwhelming desire to make his success contribute to the maximum benefit of his children. His oldest son, Austin, had become a practicing lawyer, and the father hoped that Austin would go into his office and operate in connection with his father. The double blow in 1928, losing his wife, the mother of his children, and his son, Austin, had been a real tragedy. Then came the panic of 1929, and the serious financial depression continuing in 1930, and the concern for the invalid daughter, and there is no doubt but what the father was anxious to formulate a plan for the disposition of his estate for his children’s benefit.
In 1930, J. John Hassett, Jr. was eighteen years of age, on the eve of his departure for college, and the next best hope to fulfill his father’s ambitions. The son testifies that his father had already presented him with a business enterprise, the Elmira Coal Company, and that “ From the earliest youth I had always maintained that I was going to follow in my father’s footsteps to the best of my ability, and I was going to pursue a legal career. In 1926 and 1927 I became interested in the Elmira Coal Company, which was one of father’s interests. And father lived business. We discussed it. From the time of my mother’s death on I was the only one at home with him with the exception of my sister, Bessie, who was a total and complete invalid, and his only confidant, if you will, in his own family. So we talked business morning, noon and night from May of 1928 until October of 1947 when he died.”
In September of 1930, the plans of J. John Hassett, Sr. had become crystallized, and on the 17th of the month, just before his son, J. John Hassett, Jr. was preparing to commence his college course at Holy Cross, the father had a conference with his son, and physically delivered into the possession of his son stock certificates for a total of 15,000 shares of common stock of the Wisner Park Corporation, and stock certificates representing 1,508 shares of the common stock of the Southern Tier Theater Co., Inc. representing controlling stock in said corporations. At the same time, according to the testimony, the father made *388 certain declarations, consisting of instructions and directives to said son as to the use of said stock and the duties of said son, J. John Hassett, Jr., and another son, Florence S. Hassett and a daughter, Natalie Hassett, in relation thereto. Respondents contend that the said declarations together with said delivery constitute an inter vivos trust or trusts with respect to said securities, and including other securities subsequently delivered by father to son from time to time during the period until his death in 1947.
The alleged trusts were eight in number, one for each of the eight children except Bessie Hassett. Bach included a primary life estate for Bessie, invalid daughter. There was a secondary life estate in each for the benefit of the individual child for whom it was provided. The remainder was to go to the children, if any, of the secondary beneficiary, and if he left no children to the brothers and sisters of the beneficiary. To avoid the necessity of fractional shares and for purposes of administration, the trust properties would be held and administered as a common fund.
There was no written declaration of trust, although there were certain notations in the handwriting of the father, claimed by respondents to corroborate or even to substantiate the establishment of the trust.
Bessie died in 1935.
J. John Hassett departed this life October 17, 1947, leaving a last will and testament dated October 6, 1944. The will establishes trusts for each of decedent’s brother, sister and eight children living at the date of his death. There is no essential difference between the oral inter vivos trust and the testamentary trust, as far as the beneficial interests of the children are concerned.
This proceeding commenced as a discovery proceeding under section 205 of the Surrogate’s Court Act, and developed into a trial under section 206, on the issue whether an inter vivos trust or trusts had been established by decedent in 1930. In the presentation of proof in this proceeding, the petitioner raised an objection to certain testimony on the basis of section 347 of the Civil Practice Act. Attorney for respondents claimed petitioner’s attorney did actively and consciously go in and inquire concerning the transaction; that his questions were not inadvertent and did not constitute an inadvertent waiver. Decision reserved, and testimony allowed to go in, subject to motion by attorney for petitioner to strike and over his objection. The attorney for the petitioner did not renew his objections at the *389 close of the testimony, or make any further motion to strike it out, and specifically disaffirmed an intention to do so.
The rules of law guiding us in cases of this kind, involving oral trusts of personal property, are well stated in the citations contained in the memorandum of the respondents, including: Day v. Roth (18 N. Y. 448), Gilman v. McArdle (99 N. Y. 451), Gillies v. Gillies (239 App. Div. 582), and Robb v. Washington & Jefferson Coll. (103 App. Div. 327, 349); and it is conceded by the petitioner that a valid inter vivos trust of personal property may be created by parol, although not of land.
We shall proceed with the argument of the petitioner. She admits in the present case an identified res, a designated trustee and a designated beneficiary, three of the essential elements of any valid trust. She denies an intent by the settlor to pass title, combined with delivery of the res. This brings us to a consideration of the intent of the settlor which we shall determine under the following rule approved by the court in the Robb v. Washington & Jefferson Coll, case (supra, p. 349): “ ‘Whether a trust has been created is a question of fact in each case. In deciding it the court will give effect to the relation and situation of the parties, the nature and situation of the property and the purposes the settlor had in view in making the disposition.’ ”
Under this rule, we are compelled to weigh the actual declarations of the settlor in the light of all the surrounding circumstances. Not the least of the circumstances is the personality of the settlor.
For the purpose of our discussion of the alleged oral inter vivos trust, we shall refer to J. John Hassett, Sr. as the father or the settlor or decedent; and to J. John Hassett, Jr. as the son or the trustee; and to Florence S. Hassett, son, and Natalie Hassett Rhodes, daughter, as the other trustees. (Italics mine.)
The respondents have two main theories or explanations: First: Conceding the son to be only eighteen years of age in 1930, we have a recognized parallelism between the youth and inexperience of the son and what we may call the youth and inexperience of the stock, that is, each had potential value. Although the stock was of no value in 1930, yet as the son increased in knowledge and experience, so the stock would increase in value as the obligations of the enterprises were reduced, and coincidentally the son-trustee would be able to assume his trust burdens. In theory this is reasonable, but in fact it disregards the main object of the alleged trust: the care of Bessie in case financial disaster overtook her father. Neither in the original transaction nor later did the father *390 the son as trustee any property that would have enabled the trustee to carry out the provision of the trust for Bessie, to meet a present need; on the other hand, there never was a time when the father was not in a better position to take care of Bessie with his assets retained than the trustee could have done with the property received from the father. If there had been a genuine purpose to place the trustee in a position to take care of Bessie in any contingency arising out of the depression, a man of J. John Hassett’s sagacity would have established a trust fund equal to the present need.
Confirming the above conclusion, the father recognized and assumed responsibility for the future needs of Bessie; the father’s words: “ They (the certificates) had voting control of two existing corporations, and that as the debts of the corporation were paid off, the stock certificates would increase in worth, and eventually they would be of sufficient value so that it would be no burden upon me to take care of Bessie out of the proceeds of them.”
An oral inter vivos trust must take effect in praesenti during the life of the settlor. (Robb v. Washington & Jefferson Coll., 103 App. Div. 327, supra.) It cannot have an apparent intention to take effect in the present with an actual intention to take effect in the future.
The father continued to turn over to the son additional stock certificates after the death of Bessie. This clearly shows that the father’s plan was flexible, and did not depend upon the life of Bessie.
Second: We have another contention of respondents, based on considerable testimony, that J. John Hassett had his own peculiar way of doing things, of carrying on his business transactions with a high degree of informality, in many cases refraining from written contracts, to show that an oral trust was in harmony with his methods. This point is well developed in the testimony, but it is likewise clear from the evidence that J. John Hassett never lost control of a situation, particularly in the present case. He had essential control of the stock res until he was satisfied in 1944 to name his son J. John Hassett, Jr., together with his son Florence S. Hassett and his daughter, Natalie Hassett Bhodes, executors and trustees under his last will and testament. Every act of decedent and every discernible thought contributed to the preparation of a testamentary trust, even to the training of the trustee. Very deliberately the testator anticipated the vesting of the testamentary trust by turning over the trust properties gradually to the proposed *391 trustee as he became competent to handle them. This was in harmony with the foresight and carefulness that characterized the man.
In order further to seek out the intention of the settlor, we refer again to the Robb v. Washington & Jefferson Coll, case (103 App. Div. 327, 328, supra) for another statement of the law, in headnote 6: “ The primary distinction between wills and declarations of trusts is that the former take effect in the future upon the death of the testator, while the latter take effect in praesenti during the life of the settlor.”
The testimony of J. John Hassett, Jr., on cross-examination by respondents’ attorney, raises strong doubt on the settlor’s purpose to establish a trust to take effect in the present: “ Father told me that from time to time in the future, if my actions in connection with these certificates was satisfactory, he would give me other and further things for the same purpose; that over a period of years I had an opportunity to acquire a great many things in this capacity; and that it all hinged on (a) satisfactory scholastic attainment, and (b) satisfactory operation of the certificates and assumption of responsibility, and (c) my general attitude and outlook toward business and business interests, I would say, particularly. ’ ’
The above conditions certainly are not reconcilable with the establishment of a trust to take effect in the present. They are more in harmony with trustee training, with explicit planning for the future. The tentative trustee must satisfy his father as to his attitude and ability. Here was an incentive in the most express terms. This was recognized by J. John Hassett, Jr., himself, when he testified: “At that time father dressed the conversation up with a great many reasons for it. I feel in retrospection that the principal reason was to make me work at school and study. ’ ’
Father and son both made good in accordance with this plan. As the son progressed in school and in business training under his father’s tutelage, the father continued to deliver to the son additional certificates of stock, in various corporations, for the purposes of the “ trust ”, before and after the death of Bessie in 1935, and down to the time of his own death. The plan was succeeding according to the best expectations of his father.
The relations of J. John Hassett, Sr., "with his associates also shed some light on his plans and purposes. Going back to the alleged declaration of trust in 1930, on cross-examination J. John Hassett, Jr., concluded his recital as follows: “ Needless to say, I was deeply impressed by the whole transaction, and I was *392 cautioned at the time not to talk about it with anybody outside of the family.”
On February 1, 1939, there was a meeting of the common stockholders of the Wisner Park Corporation. J. John Hassett, Jr., attended that meeting. For the purpose of the meeting, he had a proxy executed by his sister, Natalie, his brother, Florence, and himself. He voted 18,000 shares of stock at the meeting, the controlling stock. Present were his father and named individuals, associates of his father in the corporation. He voted the shares personally, and they were the shares given to him by his father. His right to vote those shares was not questioned by any person at the meeting. Presumably, neither J. John Has-sett, Sr., nor J. John Hassett, Jr., had advised the other stockholders about the trust (in accordance with the above caution). If there had been a valid inter vivos trust authentically established,in 1930, now was the time to-file the proxy voluntarily, without being challenged, to make the appropriate changes in the corporation records, and vote as trustees. For some reason not in harmony with such a course, the trustee remained silent under his father’s guidance, or at least in his presence, and voted the stock personally. Secrecy is compatible with testamentary intentions, not with a trust in its public relations. If the trust had been truly functioning at that time, we would have the records of the corporation and the testimony of the other stockholders to confirm it.
The surrounding circumstances corroborate the foregoing statements.
1. With the exception of the proxies, which were never used, the three trustees never acted together in a trustee capacity. The only concerted action was between father and son, settlor and trustee, tabulating and discussing the stocks.
2. None of the trustees performed any of the duties essential or characteristic of a trust, during the lifetime of the father: (a) There was no record made of the transaction, either originally by the settlor or subsequently by the trustees. There was no list-made of the securities, for identification, either originally by the settlor or subsequently by the trustees. There was no unequivocal delivery of the securities as long as father and son shared custody. On such tentative basis, in the event of the death of the son, the opportunity was available to cancel out the whole transaction. The testimony shows that the surviving other trustee had practically no knowledge of the matter. In the event of the death of the father, we depend upon the interpretation of the son. Although he contends for an inter vivos trust, *393 his testimony clearly favors the training of the son for the testamentary trust.
(b) No action was taken by any of the trustees to effectuate the trust outside of the family relationship, during the lifetime of the father. In particular, the very first, fundamental steps were neglected — to transfer the negotiable securities to the record ownership of the trustees.
(c) No trustee accountings were ever made by the trustees, even upon the death of Bessie, the primary life tenant. Even taking into consideration the family relationship, and the natural tendency to forgo accountings, there is no testimony by any other members of the family, outside of the trustees, that they had any knowledge of the trust.
I have not overlooked the various notations made by the deceased in his records, indicating a certain security was identified with a trust. While such notations could refer to the alleged oral trust, equally they could refer to the contemplated testamentary trust. I do not think the securities were unequivocally delivered to the trustee; they were segregated in the hands of the trustee for inclusion in the testamentary trust.
The essential intent was lacking, on the part of the alleged settlor, to create a present trust inter vivos for the care of Bessie. The acts considered here obviously did not create a testamentary trust. It results therefore that the properties which were their subject remained in the ownership of decedent and on his death were a part of his estate.
The Surrogate, therefore, directs that the properties owned by decedent during his lifetime and held by J. John Hassett, Jr., as purported trustee of an inter vivos trust, be delivered to the executors of the last will and testament of decedent to be included in the estate inventory.